## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MORGAN M., a Minor, By and** | : | **CIVIL ACTION** |
| **Through Her Parents and Natural** | : | |
| **Guardians, BARBARA B. AND** | : | |
| **ARTHUR W. M. III.,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **No. 12-3646** |
| | : | |
| **PENN MANOR SCHOOL DISTRICT,** | : | |
| **Defendant** | : | |

## M E M O R A N D U M

STENGEL, J.                                                                January 14, 2015

## I.    INTRODUCTION

Plaintiff, Morgan M., a 9 year old minor, by and through her parents Barbara B. and Arthur W. M. III., brought Civil A. No. 12-3646 against Penn Manor School District ("the District") under the Individuals with Disabilities Education Act ("IDEA"), 42 U.S.C. § 1400, Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and Chapters 14 and 15 of the Pennsylvania Administrative Code.  An administrative decision issued on March 31, 2012, by Linda M. Valentini, Psy.D., a Certified Hearing Official (the "CHO") with the Pennsylvania Department of Education, determined that the District was required to provide Morgan with sixty-three hours of compensatory education.  Plaintiff initially brought this suit seeking to recover the costs and fees incurred in connection with the administrative proceeding.  (Civ. A. No. 12-3646, Doc. Entry No. 1.)

The District brought a separate suit, Civ. A. No. 12-2688, seeking reversal of those aspects of administrative decision on which Plaintiff prevailed.[1]  Thereafter, Plaintiff filed an amended complaint in Civ. A. No. 12-3646 seeking reversal of those aspects of the administrative decision on which the District prevailed.  (Id., Doc. Entry No. 3.) Presently pending are the parties' cross motions for judgment on the administrative record.  For the reasons that follow, I vacate the CHO's order only to the extent that it required the District to provide compensatory education.

## II.    THE ADMINISTRATIVE RECORD

The request for a due process hearing in this action was filed by Morgan's parents on November 2, 2011.  (AR Ex. 9.)  They sought the development and implementation of an appropriate individualized educational program ("IEP") for Morgan, "compensatory education from the 2008/2009 school year until such a time as the District develops an appropriate education program and placement," and attorney's fees and costs.  (Id. at 3.) The CHO conducted two evidentiary hearings.  The District's Director of Student Support Services, Dr. Theresa Kreider, testified at the first hearing, conducted on January 19, 2012.  (1/19/12 N.T.)  At the second hearing, conducted on March 6, 2012, Plaintiff called Dr. Kara Schmidt, a neuropsychologist, and the District called Sally Wagner, a District itinerant autistic support teacher.  (3/6/12 N.T.)

The CHO found, in a decision dated March 31, 2012, that Morgan's medical diagnoses included epilepsy, pervasive developmental disorder, a chromosomal

---

[1] Civ. A. No. 12-2688 was consolidated with Plaintiff's action, and was closed for statistical purposes on November 2, 2012.

abnormality, and oppositional defiant disorder.  (A.R. Ex. 2, Hearing Officer Decision Findings of Fact ("HOD/FF") at 2, 3.[2])  In first grade (school year 2009-2010), Morgan's health problems significantly interfered with her school attendance.  She was absent for the equivalent of 67 days of an approximately 180-day school year.  (HOD/FF at 4.)  In second grade (school year 2010-11), Morgan's health problems caused her to be absent for the equivalent of 79 school days.  (Id. at 5, 6.)  The parties had agreed that when Morgan was absent for more than five consecutive days the District would provide a homebound teacher if Morgan was well enough to engage in instruction.  (Id. at 7.)  During first and second grades, Morgan was suffering from seizures, was largely non-verbal, and was not focused on or engaged in the learning process at home, when scheduled for independent testing, or when she returned to school.  (Id. at 8, 11, 12, 13, 17.)  The CHO found that "[g]iven the vicissitudes of Student's availability for learning, the District set up and implemented regular progress monitoring in the 2009-2010 year to obtain a clearer picture of where Student was on any given task and what was needed to get Student to improve."  (Id. at 14.)  Morgan's IEPs "were reviewed and revised frequently to address Student's needs."  (Id. at 18.)

By her kindergarten year, Morgan was described as having weaknesses in social skills and peer relations.  (Id. at 19.)  However, the CHO concluded that re-evaluation reports completed during her kindergarten year, dated November 11, 2008, and May 11, 2009, "would not lead to giving her a diagnosis of autistic spectrum disorder significant

_____

[2] Numerical record references to "HOD/FF" refer to the numbered paragraphs in the CHO's opinion.  Numerical references to "HOD" refer to the page number of the discussion portion of the opinion.

3

consideration." (Id.)  The CHO stated that Morgan's first "relevant" IEP, dated May 22,

2009, did not provide for autistic support services, however a school guidance counselor

provided social skills instruction.  (Id. at 21.)  The IEP did provide for specially

designated instruction ("SDI") offering Morgan several interventions, including

instructional, environmental, physical, verbal, non-verbal, social, and organizational

strategies.  She was to receive speech/language therapy of 40 minutes per six day cycle,

occupational therapy 30 minutes per week, 15 minutes of "consultative" services per

month, and physical therapy for 120 minutes per month.  For the 2010-11 school year,

implementation of the social skills instruction was transferred to another staff member

with the job title of Autistic Support Teacher.  (Id. at 24.)  To pave the way for this

transition, the Autistic Support Teacher had made a number of attempts to connect with

Morgan during the final weeks of the 2009-10 school year, but Morgan's absences

prevented this Teacher's direct work with Morgan until the first few days of the 2010-11

school year.  (Id. at 45.)

　　　In the interim, the School District sought the parents' permission to reevaluate

Morgan.  The parents rejected this, and asked instead for the School District to pay for an

independent educational evaluation, to which the District agreed.  (Id. at 25.)  Morgan's

mother provided information to the independent evaluator, Dr. Kara Schmidt, that lent

support for a finding of a disorder on the autistic spectrum.  (Id. at 30.)  The evaluator

observed Morgan in class for 55 minutes on September 23, 2010.  The evaluator issued a

written report in December 2010.  (Id. at 32, 44.)  The report included a number of

observations and recommendations.  The evaluator found that Morgan had significant

fine and gross motor weaknesses; had appropriate speech and language; on the day of the evaluator's observation, Morgan's Personal Care Assistant took frequent breaks during Morgan's speech and language sessions, and thus could not carry over this learning to the classroom; Morgan needed consultative autistic support training from two to five hours per week; District staff were collaborative and receptive; and feedback from the evaluator resulted in some changes to the IEP.  (Id. at 33-44.)  The School District agreed with some of those recommendations, and had already taken action consistent with them.  (Id. at 42, 47-53.)  For example, the School District had already increased the amount of time Morgan saw the Itinerant Autistic Support Teacher, had already begun consultative services, training Morgan's teachers to use a technique called "discrete trial training," and had already begun to base Morgan's instruction and training on the Assessment of Basic Language and Learning Skills system.  (Id.)

The hearing focused on the IEPs that were in effect from November 2009 to March 2012.  They included:

- A May 2009 IEP to govern the 2009-10 school year when Morgan would be in the first grade.  (Id. at 22.)

- A May 14, 2010 IEP to govern the 2010-11 school year when Morgan would be in the second grade.  (Id. at 23.)

- A series of updates to and revisions of the May 14, 2010 IEP (seven times, between May 28, 2010 and March 1, 2011).  (Id. at 28, 29; see also id. at 47-50.)

- A May 17, 2011 IEP to govern the 2011-12 school year when Morgan would be in the third grade.  (Id. at 54-56.)

- A series of updates to and revisions of the May 17, 2011 IEP (four times through December 15, 2011).  (Id. at 57-60.)

The Parents' only disagreement with the May 17, 2011 IEP was with the amount of physical therapy to be provided.  (Id. at 56.)  That IEP was revised and accepted by the Parents in July 2011.  (Id. at 60.)

During the 2010-11 school year, Morgan demonstrated increasing, well-documented success in her ability to remain on task in second grade.  (Id. at 69.)  In the spring of 2011 and the fall 2011 semester leading up to the hearing, Morgan made significant improvement in language skills, and this increase in communication skills enabled her to increase her availability for learning.  (Id. at 72.)  This was coupled with "remarkably better" attendance during the months before the hearing.  (Id. at 71.) At the time of the administrative hearing, Morgan was a third grader who spent most of her school day in a learning support class with a total of ten children, one teacher, one para-educator, three personal care assistants (one of whom was dedicated individually to Morgan), a Therapeutic Staff Support worker (who was dedicated individually to Morgan), and a Health Care Aide (who was dedicated individually to Morgan).  (Id. at 61-62.)  Morgan received instruction in reading that was imbedded throughout her program, occupational therapy, a sensory program used with Morgan by all staff, Speech and Language Therapy, social skill instruction in authentic learning situations, and other services.  (Id. at 63-70.)  The CHO noted significant improvement in attendance, language skills, peer interaction, and verbal skills.  (Id. at 69, 70, 72-79.)  In summer

2010, Morgan received 18 hours of extended school year instruction to "maintain continuity of intervention and facility maintenance and progression of skills."  (Id. at 84.)

The CHO reached several conclusions based upon these factual findings, including:  Morgan's "IEPs are appropriate in that they were reasonably calculated to provide meaningful education benefit . . . [and those IEPs] have been examined, evaluated and revised to meet Student's unique needs."  (HOD at 17.)  Her "related services . . . were appropriate. . . .  The fact that subsequent IEP revisions conferred more services does not mean that the higher level of services was appropriate at an earlier phase. . . ." (Id. at 17-18.)  She had "made meaningful educational progress in light of [her] potential. . . ."  (Id. at 18.)  However, the CHO noted "two areas of concern that remain unresolved because there are lacunae in the information made available to me at the hearing and in the documents.  (Id.)  First, she found that the appropriate level of extended school year services had been only "scantily touched upon in the hearing."  (Id. at 19.)  Given the lack of evidence, however, the CHO "decline[d] to disturb" the District's provision of 18 hours during Summer 2010.  (Id.)

Second, the CHO found that "it is unclear when the District was made aware that Student was diagnosed with an autistic spectrum disorder."  While Morgan was diagnosed during the 2009-10 school year, the CHO found that the record did not disclose the date the District was told this information.  (Id.)  The CHO acknowledged, however, that the District began to provide autistic support services during that school year, although those efforts were hampered by Morgan's attendance.  (Id. at 18-19.)  She concluded that there was a "denial of Autistic Support services for some nonspecific

7

period during the 2009-2010 school year." (Id. at 19.) She "exercise[ed] her remedial authority and set[] January 1, 2010 as the date the District had knowledge" of Morgan's diagnosis. (Id.) The CHO concluded that three hours per week was "an appropriate amount of this service," and multiplied this by the remaining 21 weeks of the 2010-11 school year, without adjustment for whether Morgan was in school during those weeks, since the Itinerant Autistic Support Teacher "could have used those hours to train and consult with staff working with Student." (Id.) She ordered the District to provide 63 (i.e., 3 times 21) hours of compensatory autistic support services over the next three years, which the District could deliver in any combination of "direct" services to Morgan and "consultative" training services to school district staff. (Id. at 19-20.)

## III.   THE IDEA AND THE COURT'S STANDARD OF REVIEW

### A. Requirements of the IDEA

Under the Individuals with Disabilities Education Act, states that receive federal educational assistance must establish "policies and procedures to ensure," among other things, that a "free appropriate public education" is available to disabled children. See 20 U.S.C. § 1412(a)(1)(A); D.K. v. Abington Sch. Dist., 696 F.3d 233, 244 (3d Cir. 2012). School districts may not ignore a disabled child's needs, nor may they await parental demands before providing special instruction. Rather, school districts must ensure that all children, "regardless of the severity of their disabilities, . . . who are in need of special education and related services, are identified, located, and evaluated . . . ." 20 U.S.C. § 1412(a)(3)(A). Once a child is identified, the school district must develop an IEP for the child that is uniquely tailored to his or her individual needs. While an IEP need not

maximize the potential of the child, "it must provide meaningful access to education and confer some educational benefit upon the child for whom it is designed." Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999) (internal quotations and citations omitted); Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004). It is well settled that, in this context, "education" extends beyond discrete academic skills and includes the social, emotional, and physical progress necessary to move the child toward meaningful independence and self-sufficiency, consistent with the child's cognitive potential. See, e.g., M.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 393-94 (3d Cir. 1996). A disabled child who has not received an appropriate IEP is entitled to compensatory education. Id. at 391-92.

The IEP must be "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." Shore Reg'l, 381 F.3d at 198 (internal quotation marks omitted). It must include several elements, including a statement of the student's "present levels of academic achievement and functional performance," a statement of "measurable annual goals," a description of the progress towards those goals, and a list of the supplementary aids, services, and individual accommodations provided to the student. 20 U.S.C. § 1414(d)(1)(A). The adequacy of an IEP is calculated as of the time it is offered to the student. Fuhrmann ex rel. Fuhrmann v. E. Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993).

The educational benefit provided by the school through the IEP must be more than de minimis; it must be meaningful when viewed "in relation to the child's potential." Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 185 (3d Cir. 1988). The

IDEA requires a plan of instruction under which some educational progress is likely.  Id. at 183.  A district does not have to provide "the optimal level of services," so long as a "basic floor of opportunity" is made available.  D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010).  There is no bright-line rule to determine whether a student is receiving a meaningful educational benefit.  Id. at 568.  Instead, courts look at all of the factors relevant to that student's educational potential.

### B.  Timeliness of Claims

Two subsections of 20 U.S.C. § 1415 guide the limitations period for IDEA claims.  20 U.S.C. § 1415(f)(3)(C) provides that "[a] parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint." Section 1415(b)(6)(B) provides "[a]n opportunity for any party to present a complaint . . . which sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint."  20 U.S.C. § 1415(b)(6)(B).

In I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist., 842 F. Supp. 2d 762 (M.D. Pa. 2012), the court addressed the relationship between these two statutory provisions and found that they should be read to provide two distinct time limitations.  Id. at 773-74. The court explained that Section 1415(f)(3)(C), "which controls the limitations period for filing an IDEA action, requires that a plaintiff must request their due process hearing within two years of the date that the parent or agency 'knew or should have known' about the alleged violations forming the basis of the [c]omplaint."  Id. at 774.  Section

1415(b)(6)(B), the court explained, "provides a limitations period for the scope of the action, that is, which alleged violations or harms may be included in the complaint." Id. Similarly, in G.L. v. Ligonier Valley Sch. Dist. Auth., Civ. A. No. 13-34, 2013 WL 6858963 (W.D. Pa. Dec. 30, 2013), the United States District Court for the Western District of Pennsylvania agreed that these two sections are appropriately read as separate provisions, with one setting a limitations period for the filing of claims and the other temporally limiting the scope of the alleged violations. Id. at *3-4. Specifically, the court explained that, under Section 1415(f)(3)(C), the IDEA plaintiff has two years after the "known or should have known" date to file a complaint requesting a due process hearing, and under Section 1415(b)(6)(B), the plaintiff's claims may include allegations of IDEA violations occurring up to two years prior to the "known or should have known" date. Id. at *4. Thus, the first subsection is forward-looking, setting a time limit beyond the "known or should have known" date for a plaintiff to file a complaint, while the latter subsection provides a "look-back" limit on liability, prohibiting the plaintiff from bringing allegations of an IDEA violation occurring more than two years prior to the "known or should have known" date. Id.

### C.  Scope of Review

"Judicial review in IDEA cases differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 757 (3d Cir. 1995).  I apply a "modified de novo" standard of review, under which factual findings from the administrative proceedings are to be accorded "due

11

weight." S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003).

Under this standard, the hearing officer's factual findings are to be considered prima facie

correct, but I may disagree with those findings if I explain my basis for doing so. See id.;

Carlisle Area Sch. v. Scott P., 62 F.3d 520, 527 (3d Cir. 1995) ("[A]lthough the district

courts must consider the administrative findings of fact, they are free to accept or reject

them . . . .  But if the district court chooses to depart from the agency's ruling, it should

provide some explanation for its departure.").  I must, however, accept the hearing

officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the

record would justify a contrary conclusion or unless the record read in its entirety would

compel a contrary conclusion." S.H., 336 F.3d at 270 (quoting Carlisle, 62 F.3d at 529).

The hearing officer's application of legal standards and conclusions of law is

subject to plenary review. Warren G. v. Cumberland Cnty. Sch. Dist., 190 F.3d 80, 83

(3d Cir. 1999).  However, a reviewing court may not "substitute its own notions of

educational policy for those of local school authorities." S.H., 336 F.3d at 270 (quoting

M.M. v. Sch. Dist. of Greenville Cnty., 303 F.3d 523, 531 (4th Cir. 2002)).  The Hearing

Officer's decisions regarding the award of compensatory education are subject to plenary

review as conclusions of law. P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.,

585 F.3d 727, 735 (3d Cir. 2009).  Whether the District fulfilled its "child find" and

FAPE obligations are subject to clear error as questions of fact. Id.; Ridley Sch. Dist. v.

M.R., 680 F.3d 260, 270 (3d Cir. 2012).  The party challenging the administrative

decision bears the burden of persuasion. Ridley Sch. Dist., 680 F.3d at 270.

Accordingly, Plaintiffs bear the burden with regard to the amount of compensatory

education awarded, and the District bears the burden with regard to the remaining issues in this appeal.

## IV.   THE DISTRICT'S MOTION

The District seeks reversal of (1) those portions of the CHO decision finding that it failed to provide Morgan with a FAPE from January 1, 2010 to June 2010 by not providing Autistic Support Services, and (2) the order that the District provide 63 hours of compensatory education services.  (Def. Mem. at 1.)  The District argues that the CHO improperly focused on the categorical label of "autistic support," rather than focusing upon the District's legal duty under the IDEA to identify and provide for the service needs of the child.  Because she focused on the categorical label of autistic support, the District asserts that the CHO made erroneous findings of fact.  First, it challenges the CHO's finding that the "first relevant IEP [drafted in May 2009] does not provide for autistic support services."  (HOD/FF 21.)  Second, it challenges the finding that autistic support services were not initiated until September 2010.  (HOD at n.9.)  The District argues that in making these findings the CHO ignored the substance of the services listed in Morgan's IEP for the 2009-10 school year.  I conclude that this argument has merit.

Under the Pennsylvania regulations, "autistic support" means:

Services for students with the disability of autism who require services to address needs primarily in the areas of communication, social skills or behaviors consistent with those of autism spectrum disorders.  The IEP for these students must address needs as identified by the team which may include, as appropriate, the verbal and nonverbal communication needs of the child; social interaction skills and proficiencies; the child's response to sensory experiences and changes in the environment, daily routine and schedules; and, the need for positive behavior supports or behavioral interventions.

22 Pa. Code § 14.131(a)(1)(i).  The District is correct that the record shows that it in fact included these services in Morgan's May 2009 IEP governing the 2009-10 school year, and that the CHO's factual finding to the contrary should be vacated.  The District acknowledged in the May 2009 IEP that Morgan has "communication needs," that she was diagnosed with developmental delays, and that she suffered from "on demand language planning disorder," sensory processing disorder, and oral sensory processing disorder.  (A.R. Ex. 8 at S.9.3-9.4).  After describing her then current performance in social skills, peer interaction, her ability to initiate and respond appropriately in conversations, and her classroom behaviors, the IEP: (1) recognized the need to provide services to Morgan to improve her empathetic social skills with a variety of communication partners, (2) established sensory processing skills as an area for work with an occupational therapist, and (3) established behavior goals relating to receptive communication with teachers and peers.  (Id. at S.9.6-9.7, 9.10, 9.12, 9-21-9.22.)  The IEP listed the specially designed instruction services and educational modifications the District was to provide to Morgan in special education classrooms and in all school environments during the school year.  The modifications included:  physical assistance; using verbal, visual, auditory, or tactile cues to maintain attention; multisensory strategies to maintain focus; affording her "wait time" to process information; using her name, rather than "you" when directing a task; physical assistance with bathroom needs; limiting auditory stimuli; ignoring inappropriate attention-getting behavior; use of rephrasing and elaboration to promote understanding; use of story-telling and role playing to develop understanding; prompting to listen and think; modeling by staff of

14

appropriate nonverbal communication, and conversational routines; use of alternative writing surfaces; programming activities to provide opportunities for physical manipulation tasks; and direct social skills instruction related to interacting with peers, working on challenging tasks, and how to gain adult attention.  (Id. at S.9.23-26)  The specially designed instruction services included speech and language therapy, occupational therapy, and physical therapy.  (Id. at S.9.26.)

The IEP also provided that Morgan was to receive full-time special education supports and services (i.e., more than 80% of the school day) provided by special education personnel for the balance of the 2008-09 school year, and supplemental special education supports and services (more than 20% of the day but less than 80% of the day) provided by special education personnel for the 2009-10 school year.  (Id. at S.9.28.)  Similar entries are also contained in Morgan's May 2010 IEP covering the next school year.  (Id. at S.10.6-10.13, S.10.21-10.23.)  For the 2010-11 school year, the District was to provide Morgan with full time special education supports and services provided by special education personnel.  (Id. at S.10.33.)  In the IEP for the 2011-12 school year, the District began to provide "consultative itinerant autistic support" for up to 150 minutes per 6 day cycle, to provide training to Morgan's teachers on the strategies to be used to meet her needs.  (Id. at S.27.41.)

The CHO ignored the evidence of the services Morgan received in the 2009-10 school year because the term "autistic support" was not specifically included in the IEP to describe those services and did not mandate that they be provided by an itinerant autistic support teacher.  As noted, the CHO appears to have based her determination that

15

Morgan was **not** receiving services during the 2009-10 school year on the fact that

implementation of the social skills instruction was later transferred in a subsequent year's

IEP from the guidance counselor to another staff member with the job title of Autistic

Support Teacher.  (HOD/FF 24.)  This ignores the content of the 2009-10 IEP, stating

that services were to be provided, and the evidence that they were being provided by the

guidance counselor.

The arguments raised by Plaintiff on this issue of factual error are insubstantial.

Plaintiff concedes that the "Guidance Counselor provided social skills instruction to

[Morgan] during the 2009-2010 school year."  (Pl. Br. at 6 (quoting HOD/FF 21).)  She

argues, however, that the award of compensatory education cannot have been premised

upon a failure to provide services since the CHO specifically found that such instruction

was in fact provided.  Rather, Plaintiff contends that the award was premised upon the

District's failure to include in the 2009-10 IEP the consultative services performed by the

itinerant special education teacher included in later IEPs.  I reject this argument.  The fact

that the District, after reevaluation studies were undertaken, changed the level of services

that Morgan received during subsequent school years is not evidence that it failed to

provide a FAPE during the 2009-10 school year.  The CHO certainly recognized this

when she concluded that all of Morgan's "IEPs are appropriate in that they were

reasonably calculated to provide meaningful educational benefit and have been living

documents which, due to the receptiveness of the District and the diligence of the Parents,

have been examined, evaluated and revised to meet [Morgan's] unique needs . . . .  [T]he

fact that subsequent IEP revisions conferred more services does not mean that the higher

level of services was appropriate at an earlier phase of [Morgan's] development." (HOD at 17-18.)

There is, accordingly, a clear inconsistency between the CHO's finding that the District provided the appropriate level of services during the 2009-10 school year and her determination that an award of compensatory education was required for that year. Rather than base her award on evidence in the record, the CHO's decision makes clear that she based her award on evidence that was missing from the record. After having found that the District provided the appropriate level of services for school year 2009-10, the CHO added:

> There are two areas of concern that remain unresolved because there are lacunae in the information made available to me at the hearing and in the documents. First, it is unclear when the District was made aware that [Morgan] was diagnosed with an autistic spectrum disorder. . . . It seems that at some point during the 2009-10 school year the specific autistic spectrum diagnosis was conferred, but the initial source of that diagnosis and the date that the District became aware of that diagnosis is not revealed in the record. . . . I find that because of this lapse, [Morgan] is entitled to compensatory education for the denial of Autistic Support Services for some nonspecific period during the 2009-10 school year, after November 2, 2009.

(HOD at 18-19.)  The CHO's award of compensatory education to Plaintiff based on a lack of evidence clearly violates the burden of proof in IDEA cases.  See Schaffer v. Weast, 546 U.S. 49, 59 (2005); L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 392 (3rd Cir. 2006) (holding that the burden of proof is on the party bringing the administrative complaint (here the Plaintiff)).

Accordingly, I conclude that the District is entitled to judgment on the administrative record vacating the award of compensatory education because Plaintiff did not prove that the District failed to provide a FAPE for the 2009-10 school year.

## V.   PLAINTIFF'S MOTION

Plaintiff seeks judgment on the administrative record vacating that portion of the CHO decision that failed to award compensatory education for the District's alleged failure to provide Morgan a FAPE during the 2010-11 school year.  Plaintiff asserts that the CHO made three errors:  (1) failing to find that the District violated its "child find" obligations by not conducting a timely evaluation and a proper identification of Morgan's disability; (2) failing to conclude that Morgan's IEPs were inappropriate; and (3) failing to award an appropriate amount of compensatory education.  Plaintiff notes that at the administrative hearing Dr. Kara Schmidt, who had conducted a comprehensive psychoeducational and neuropsychological evaluation of Morgan in September 2010 at the request of Morgan's parents, (3/6/12 N.T. at 181-82), recommended in an evaluation that was sent to the District on December 9, 2010 that an autism support specialist be engaged to train District staff and provide ongoing supervision.  (Id. at 187-89.)  Dr. Schmidt testified that the District had misidentified Morgan's disability classification, leading the District to belatedly change her classification on September 9, 2011.  (Id. at 190, S.34.9.)  Plaintiff contends that the District's failure to perform a proper evaluation of the type later performed by Dr. Schmidt, led to it failing to provide Morgan a FAPE prior to September 9, 2011.  Plaintiff argues that it was error for the CHO to find that

Morgan's pre-September 9, 2011 IEPs provided a FAPE since they did not include

extended school year services, occupational therapy, and speech and language therapy.

### A.  Child Find Obligations

The IDEA's "Child Find" provision requires States to ensure that "all children

residing in the state who are disabled, regardless of the severity of their disability, and

who are in need of special education and related services are identified, located and

evaluated."  20 U.S.C. § 1412(a)(3).  School districts have "a continuing obligation . . . to

identify and evaluate all students who are reasonably suspected of having a disability

under the statutes."  P.P., 585 F.3d at 738.  A child who is suspected of having a

qualifying disability must be identified "within a reasonable time after school officials are

on notice of behavior that is likely to indicate a disability,"  W.B. v. Matula, 67 F.3d 484,

501 (3d Cir. 1995), even if the child is advancing from grade to grade.  D.K., 696 F.3d at

249 (citing 34 C.F.R. § 300.111(c)(1); accord Bd. of Educ. of Fayette Cnty. v. L.M., 478

F.3d 307, 313 (6th Cir. 2007); Taylor v. Altoona Area Sch. Dist., 737 F. Supp. 2d 474,

484 (W.D. Pa. 2010)).  A school district's failure to timely evaluate a child who it should

reasonably suspect of having a disability constitutes a procedural violation of the IDEA.

D.K., 696 F.3d at 249.

Plaintiff argues that when Morgan entered the District in September 2009, the

District, rather than conducting an evaluation like the one performed by Dr. Schmidt,

relied on a Reevaluation Report ("RR") dated May 11, 2009, created by the Lancaster

County Intermediate Unit 13 ("IU-13").  (Pl. Mem. at 10 (citing S.8).)  Plaintiff asserts

that, due to her seizure disorder, the RR classified Morgan's primary disability as "Other

Health Impaired," with a secondary classification of "Speech/Language Needs."  Plaintiff

faults the District for failing "to conduct its own evaluation despite the fact that IU-13's

RR failed to comprehensively evaluate and properly identify Morgan."  (Pl. Mem. at 10.)

I find that the record reflects that the factual assertions contained in this argument are

inaccurate.  I further find that the CHO was correct in her conclusion that the District

complied with its initial Child Find obligations.

First, Morgan entered the District in September 2008, not 2009, when she

transitioned from IU-13's preschool program to kindergarten.  (A.R. Ex. 8 at S.3.1.)

Second, the District did not rely upon the IU-13 RR from May 2009, rather than conduct

its own evaluation.  The record reflects that the District contracted with IU-13 to conduct

an initial evaluation when Morgan was enrolled in 2008.  (Id. at S.3.)  In November 2008,

IU-13 conducted a further evaluation, serving in the capacity of an agent of the District,

which acknowledged that the District, not IU-13, was Morgan's local education agency.

(Id. at S.5.2.)  Finally, an RR conducted in May 2009 (id. at S.8), and Morgan's IEP for

the 2009-10 school year, dated September 2009 (id. at S.9), also were conducted by IU-

13 as agent for the District.  I conclude, therefore, that there is no factual basis upon

which the CHO could have found that the school district failed in its initial Child Find

obligation to timely evaluate Morgan when she enrolled in the District because IU-13,

rather than the District, conducted the evaluations.

## B.  Inappropriate IEPs

Next, Plaintiff argues that the CHO erred in concluding that the IEPs provided

Morgan with a FAPE.  Specifically, Plaintiff argues that the CHO performed no analysis

and provided no explanation for her conclusion.  (Pl. Mem. at 11.)  Plaintiff contends that

the CHO should have considered Dr. Schmidt's opinions to find that the District failed to

provide appropriate extended school year services, occupational therapy and

speech/language services.  (Id. at 14.)  Plaintiff notes that, after it received Dr. Schmidt's

evaluation, the District began to increase these services, supporting the premise that an

IEP listing the supports and services eventually provided should have been implemented

from the time Morgan entered the District.

### 1. Extended School Year Services

Plaintiffs assert that the District failed to offer Extended School Year ("ESY")

services for Summer 2009, and the 18 hours of services provided during Summer 2010

was inadequate.[3]  I find that any claim regarding Summer 2009 is barred by the statute of

limitations; the request for a due process hearing in this action was filed by Morgan's

parents on November 2, 2011, more than two years after those services would have been

provided.  (AR Ex. 9.)  I also conclude that Plaintiff has failed to prove her entitlement to

additional ESY services for Summer 2010.

ESY services are intended to prevent loss of attained skills in targeted student

populations at risk for regressing during long programming breaks, or who are at risk of

taking an undue amount of time to recoup such skills or who meet other criteria outlined

---

[3] I note that Plaintiffs also mention Summer 2011, but do not appear to actually argue that there was a denial of FAPE for failure to provide ESY services during that summer.  (See Pl. Mem. at 16 (stating that "[t]he District's initial Summer 2011 recommendation of only 30 hours with no Autistic Support was inadequate. . . .  Only after numerous phone calls and emails . . . did the District offer a marginally appropriate level of support for the Summer of 2011. . . ." (internal citation omitted)).)  Accordingly, I do not consider Summer 2011.

in the Pennsylvania education regulations.  34 C.F.R. § 300.106; 22 Pa. Code § 14.132.

"ESY Services are appropriate when the benefits accrued to a disabled child during a

regular school year will be significantly jeopardized if he is not provided with an

educational program during the summer months."  M.M., 303 F. 3d at 537 (citing Alamo

Heights Indep. Sch. Dist. v. State Bd. of Educ., 790 F.2d 1153, 1158 (5th Cir. 1986);

Johnson v. Indep. Sch. Dist. No. 4, 921 F.2d 1022, 1028 (10th Cir. 1990).  The United

States Court of Appeals for the Third Circuit has recognized that all students experience

some risk of regression; thus "the mere fact of likely regression is not a sufficient basis,

because all students, disabled or not, may regress to some extent during lengthy breaks

from school.  ESY Services are required under the IDEA only when such regression will

substantially thwart the goal of 'meaningful progress.'"  Id. (quoting Polk, 853 F.2d at

184.)  Therefore, only in the exceptional case, where essentially all progress made during

the school year will be lost during the vacation break, are ESY services required.  M.M.,

303 F.3d at 537-38.  ESY services eligibility is predicated upon measurable evidence of

regression or recoupment difficulties associated with skills and behaviors that are

addressed in the student's IEP.  Progress on goals in consecutive IEPs also provides

information for determining ESY services eligibility.  22 Pa. Code § 14.132(b).

     In her decision, the CHO found that "no useful evidence was given supporting or

undermining the offer of the summer 2010 ESY program of 18 hours. . . ."  (HOD at 19.)

Plaintiff contends that this finding is error because the record reflects that Morgan

suffered regression between the 2009-10 and 2010-11 school years (i.e. Summer 2010)

due to inadequate ESY services.  Plaintiff cites as proof of regression that at the end of

the 2009-10 school year Morgan was able to identify 62% of upper case letters.  At the

end of the limited ESY program, she was able to identify only 54%, and at the start of the

2010-11 school year had dropped to 46%.  (Pl. Mem. at 15.)  Plaintiff contends that it

"required one entire marking period to recoup these skills to her prior level."  (Id. (citing

A.R. Ex. 8 at S.16.1).)

Having extensively reviewed the data cited by Plaintiff, I find that Plaintiff has

focused only upon the one data point that might support regression, while ignoring the

other "useful evidence" the CHO examined.  The percent for upper case letter recognition

did decrease during Summer 2010.  But Morgan showed increases in the percentage for

lower case letter recognition, in her recognition of some simple words and her written

name, and in her ability to write her name.  (Id. at S.16.1-5.)  Considering all of the

evidence of regression, I find there is no basis to disturb the CHO's finding that the

provision of ESY services in Summer 2010 was appropriate.

### 2. Occupational Therapy and Speech/Language Services

Because Morgan showed a "burst of her language competency" and significant

increase in her developmental skills after her occupation therapy and speech/language

services were increased during the 2011-12 school year in response to Dr. Schmidt's

recommendations, Plaintiff argues that the District's failure to provide those level of

services at earlier times denied Morgan a FAPE.  The CHO disagreed with this premise,

finding that the quantity of services was appropriate in kind and amount at all relevant

times, and the fact that services were increased over time did not mean that higher levels

of services were appropriate at an earlier phase of Morgan's development.  (HOD 17-19.)
I conclude that Plaintiff has not met her burden to show that this finding is erroneous.

The District notes, and the Plaintiff ignores, that over the time period within the statute of limitations more than just the level of services changed.  Morgan's health improved over this time, and her level of attendance at school — which had earlier been negatively impacted by her health — also increased.  Plaintiff's argument also ignores the fact that the District had begun to implement some of Dr. Schmidt's eventual recommendations during the 2010-11 school year, prior to Morgan's "burst of competency" in the 2011-12 school year, including the training of Morgan's teachers by the itinerant autistic support teacher.  Finally, the District notes that no witness testified that Morgan would have benefited from higher levels of service at an earlier time.

Accordingly, I find that there is no basis to disturb the CHO's finding on the Occupational Therapy and Speech/Language Services issue.

## VI.    CONCLUSION

For the reasons stated, I grant the District's Motion for Judgment on the Administrative Record and vacate that part the CHO's opinion granting Morgan compensatory education.  I deny Plaintiff's Motion for Judgment on the Administrative Record.

An appropriate Order follows.